UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MIC GENERAL INSURANCE CORPORATION,

                                         Plaintiff,

            -v-

WILFRIDO CABRERA and LUIS CRUZ,

                                         Defendants.

---

20 Civ. 4855 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision resolves an insurance coverage dispute arising out of a slip-and-fall on ice

outside a residential property.  Plaintiff MIC General Insurance Corporation ("MIC General")

moves, after discovery, for summary judgment against defendants Wilfrido Cabrera ("Cabrera")

and Luis Cruz ("Cruz") (collectively, "defendants").  Dkt. 44 ("Mot.").  MIC General seeks (1) a

declaratory judgment that an insurance policy it issued to Cabrera excludes coverage for claims

that Cruz, a tenant of Cabrera's, pursues against Cabrera in a slip-and-fall action pending in New

York state court; and (2) authorization to cease providing a courtesy defense to Cabrera in that

action.  For the reasons that follow, the Court grants the motion in full.

I.      **Background**[1]

        A.      **Factual Background**

                1.      **The Building**

        In 2006, Cabrera purchased a residential property located at 53-02 102nd Street, Corona,

New York (the "Building").  Kohane Decl. ¶ 3; Cabrera Dep. at 23.  Cabrera made his living, in

---

[1] This account draws from the parties' submissions in support of and in opposition to the motion
for summary judgment, including the declarations of Dan D. Kohane, Dkt. 45 ("Kohane Decl."),
Daniel Brownsey, Dkt. 46 ("Brownsey Decl."), and Gregory J. Gallo, Dkt. 48, and the exhibits

part, by maintaining the Building as an income-producing rental property. Cabrera Dep. at 28;
*see* Certification at 2 (Cabrera certifying to MIC General that the Building is "rented"). Cabrera
has rented the Building out, listing it as an income-producing property on his tax returns since its
2006 purchase. Cabrera Dep. at 23; *see* Tax Returns at 6, 36, 55. For instance, each year
between 2017 and 2019, Cabrera listed the Building, by its address, on the "Supplemental
Income and Loss" schedule on his personal income tax returns. During each of those three years,
he reported rental income and expenses from the Building: specifically, in 2017, income of
$84,000 and expenses of $91,014; in 2018, income of $84,000 and expenses of $108,074; and in
2019, income of $98,400 and expenses of $115,929. *See* Tax Returns at 6, 36, 55.

As the Building's owner, Cabrera generally took care of repairs and basic maintenance at
the Building. His responsibilities included taking out trash, fixing broken pipes, remodeling,
painting, and clearing snow and ice from the property. Cabrera Dep. at 24, 30, 51–52;
Cashabamba Dep. at 13; Romero Dep. at 13; Cruz Dep. at 12–13, 15–17.

The Building comprises two family units—one upstairs and one downstairs. Each has
three bedrooms. As of Cruz's accident (March 5, 2019), approximately 20 individuals resided in
the six bedrooms. Kohane Decl. ¶ 21. The downstairs unit housed nine people: Cabrera resided
in one bedroom, Cabrera Dep. at 11–12; Maria Cashabamba ("Cashabamba") and her three
children resided in the second, Cashabamba Dep. at 7; and Vanessa Romero ("Romero") and her
husband and two children resided in the third, Romero Dep. at 10–11. Cashabamba and Romero
collectively paid Cabrera $1,500 monthly in rent. Cabrera Dep. at 9.

---

attached thereto, *see* Dkts. 45-5 ("Cabrera Dep."), 45-6 ("Tax Returns"); 45-7 ("Cruz Dep."), 45-8 ("Cashabamba Dep."), 45-9 ("Romero Dep."); 46-1 ("Policy"); 46-2 ("Certification"), 46-3 ("Disclaimer"). Except as stated herein, the facts set out are not in dispute.

The three bedrooms on the top floor housed approximately 11 people: Cruz resided in one bedroom with his girlfriend, Cruz Dep. at 8–9; Eric Gonzalez ("Gonzalez") and his partner (and potentially another woman and her son[2]) resided in the second, *id.* at 7–10; and Gonzalez's brother and his wife and their son, and Gonzalez's sister and her son, resided in the third, *id.* The Gonzalez family collectively paid Cabrera $2,500 monthly in rent. Cruz paid Gonzalez $850 monthly in rent. Cabrera Dep. at 9–10; Cruz Dep. at 11–12.

### 2. Cruz's Accident and Lawsuit

To take out garbage, residents of the Building must exit it and walk along the sidewalk toward the back of the Building, where the garbage bins are located. Kohane Decl. ¶¶ 15, 17; Cruz Dep. at 20–24; Dkt. 50, Ex. B. On March 5, 2019, while taking garbage from his room to the garbage bins, Cruz claims he slipped on black ice that had built up on the sidewalk abutting the Building. Kohane Decl. ¶ 3; Cruz Dep. at 20–21. The accident occurred on the sidewalk located at the corner of the Building. Cruz Dep. at 20. As Cruz described the accident, he "went down the stairs and . . . walked towards the containers of the garbage," when he "slipped with that black ice that was there" and "broke [his] leg." *Id.* at 21.

On December 26, 2019, Cruz brought a negligence action against Cabrera in New York State Court in Queens County. Cruz alleged that Cabrera had negligently failed to remove the ice, in violation of his alleged duty to safely maintain the premises (the "Underlying Action"). Kohane Decl. ¶¶ 3, 6, Ex. D. That action is pending.

---

[2] The deposition testimony regarding Gonzalez's roommates suggests but does not conclusively state that the woman and child lived in the room. MIC General so states in its brief; defendants do not contest this point; and the Court therefore assumes such to be true. This particular fact is not determinative of any issue resolved herein.

### 3.   The Insurance Policy

MIC General had issued a homeowner's insurance policy to Cabrera for the Building,

effective, as relevant here, from February 22, 2019 to February 22, 2020.  Kohane Decl. ¶ 7; *see*

*generally* Policy.  Relevant here are two exclusions in the Policy: a "Business Pursuits

Exclusion" and a "Rental Exclusion."

The "Business Pursuits Exclusion" excludes from coverage liability for a bodily injury:

> arising out of or in connection with a "business" engaged in by an "insured."  This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstances, involving a service or duly [sic] rendered, promised, owed or implied to be provided because of the nature of the "business."

Policy at 72.  "Business" is defined to mean "trade, profession or occupation."  *Id.* at 71.

The "Rental Exclusion" excludes from coverage liability for a bodily injury:

> (1) arising out of the rental or holding for rental of any part of any premises by an "insured."  This exclusion does not apply to the rental or holding for rental of an "insured location:"
>
>> (a) on an occasional basis if used only as a residence;
>>
>> (b) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or
>>
>> (c) in part, as an office, school, studio or private garage.

*Id.* at 72.  For purposes of the instant motion, it is undisputed that Cabrera is the "insured" and

that the Building is the "Insured location."[3]

---

[3] MIC General included in its complaint, and has reserved its right to argue in the alternative at trial, that Cabrera does not live at the Building and that the Building therefore is not an "insured location."  *See* Dkt. 1 ¶¶ 24–34; Mot. at 2 n.1.  But for purposes of this motion, MIC General has disclaimed that argument, and assumes *arguendo* that the Building is an "insured location."  *See* Mot. at 2 n.1.

### 4.  MIC General's Disclaimer and Courtesy Defense

On January 31, 2020, Cabrera tendered the Underlying Action to MIC General.  Kohane

Decl. ¶ 9.  On February 6, 2020, after investigating, MIC General issued a Disclaimer to Cabrera

stating that, for multiple reasons, the Policy did not cover him in connection with Cruz's lawsuit.

Relevant here, the Disclaimer stated that the Business Pursuits Exclusion and Rental Exclusion

each applied because Cruz's injuries, as alleged, "arose out of or [were] in connection with"

Cabrera's business and/or his "rental or holding for rental" part of the Building. *See* Disclaimer

at 5–6.  Nonetheless, MIC General agreed to provide a courtesy defense to Cabrera in the

Underlying Action until a court had held its Disclaimer valid. *Id.* at 2, 6; Kohane Decl. ¶ 12.

### B.  Procedural Background of This Action

On June 24, 2020, MIC General filed the Complaint.  It sought a declaratory judgment

that under the Policy, MIC General is not obligated to defend or indemnify Cabrera in the

Underlying Action and that MIC General may cease providing Cabrera a defense.  Dkt. 1.  As of

August 19, 2020, neither defendant had answered; MIC General thus moved for a default

judgment against Cabrera and Cruz.  Dkt. 13.  That same day, Cabrera answered.  Dkt. 18.  On

August 20, 2020, in light of Cabrera's answer and the Court's preference for resolving lawsuits

on the merits, the Court *sua sponte* denied the motion for default judgment against Cabrera.  Dkt.

20.

On August 24, 2020, Cruz filed an answer.  Dkt. 23.  On August 31, 2020, in response to

a Court order, counsel for Cruz filed an affidavit explaining that he had signed a stipulation with

MIC General extending the time to answer or otherwise appear to August 24, 2020.  Dkt. 26.  On

September 2, 2020, in light of the stipulation, the Court denied the motion for default judgment

against Cruz.  Dkt. 27.  The case proceeded to discovery.

On May 11, 2021, after the close of fact discovery, MIC General filed the instant motion for summary judgment. Dkt. 44. On June 4 and 5, 2021, Cabrera and Cruz, respectively, filed oppositions. Dkts. 49, 51. On June 15, 2021, MIC General filed a reply. Dkt. 54.

## II.    Legal Standards

### A.    Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against

whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**B.    Insurers' Duties to Defend and Indemnify**

Under New York law, an "insurer's duty to defend its insured arises whenever the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy." *Stein v. N. Assur. Co. of Am.*, 617 F. App'x 28, 30 (2d Cir. 2015) (summary order) (quoting *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 170 (N.Y. 2002)).  Accordingly, the insurer's "duty to defend is broader than its duty to indemnify." *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006). This places a "heavy burden" on the insurer, which "may only disclaim its duty to defend if it has demonstrated, as a matter of law, that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision." *Stein*, 617 F. App'x at 30 (cleaned up).

Whether the insurer has a duty to defend the insured is "ordinarily ascertained by comparing the allegations of a complaint with the wording of the insurance contract." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 144 (2d Cir. 2004); *see also Swan Consultants Inc. v. Travelers Prop. Cas. Co.*, 360 F. Supp. 2d 582, 588 (S.D.N.Y. 2005) ("[If] the factual allegations of the underlying complaint indicate that there is 'no basis for recovery within the coverage of the policy . . . , [a court] may sustain [the insurance company's] refusal to defend.'" (quoting *Allstate Ins. Co. v. Mugavero*, 589 N.E.2d 365, 370 (N.Y. 1992)) (internal quotation omitted)). "[W]here an insurer's duty to defend turns on an unresolved factual dispute, the duty to defend lasts only until the factual ambiguity is resolved in favor of the insurer." *Stein*, 617 F. App'x at 30–31 (cleaned up).

Generally, "[c]laims concerning indemnification obligations . . . are not ripe for adjudication until liability has been imposed upon the party to be indemnified." *FSP, Inc. v. Societe Generale*, No. 02 Civ. 4786 (GBD), 2003 WL 124515, at *4 (S.D.N.Y. Jan. 14, 2003), *aff'd and remanded*, 350 F.3d 27 (2d Cir. 2003), *and adhered to on reconsideration*, 2005 WL 475986 (S.D.N.Y. Feb. 28, 2005); *see also Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261 (S.D.N.Y. 2013) ("Courts often distinguish between the duty to defend and the duty to indemnify in determining whether each issue posed in a declaratory judgment action is ripe for adjudication" because "the duty to defend is triggered by the filing of a lawsuit while the duty to indemnify is triggered by a determination of liability."), *aff'd sub nom. Atl. Cas. Ins. Co. v. Greenwich Ins. Co.*, 548 F. App'x 716 (2d Cir. 2013) (summary order). However, "a decision on the duty to defend will sometimes produce a definite answer with respect to the duty to indemnify as well," in which case the indemnity claim is ripe for adjudication. *Value Waterproofing, Inc.*, 918 F. Supp. 2d at 261. In particular, "to the extent that the questions about insurance coverage which arise in the declaratory judgment action can be separated from the issues of liability and causation that are being litigated in the underlying lawsuit, there is far less reason to withhold judgment on the question of indemnification." *Id.*

## III.    Discussion

Whether MIC General is obligated to defend Cabrera turns on whether the Policy covers Cruz's type of injury. *See Union Mut. Fire Ins. Co. v. Tejada*, No. 20 Civ. 9166 (PAE), 2021 WL 3146032, at *3 (S.D.N.Y. July 23, 2021). Importantly, MIC General's assertion that it is not so obligated does not turn on the merits of Cruz's negligence claims in the Underlying Action. Rather, based on two exclusions in the Policy arising from Cabrera's rental of apartments within the Building, including to Cruz, MIC General "seeks a declaration that it does not have to defend or indemnify [him] because the policy excludes [Cruz]'s type of injury." *Id.* As there has been

full discovery with respect to those exclusions, MIC General's claims as to its duty both to indemnify and defend are both ripe for adjudication.

### A.      The Business Pursuits Exclusion

The Business Pursuits Exclusion excludes from coverage liability for a bodily injury "arising out of or in connection with" a "business" engaged in by an insured.  Policy at 72.  The exclusion applies to acts or omissions "involving a service or du[t]y rendered, promised, owed or implied to be provided because of the nature of the 'business.'"  *Id.*

Thus, if the Underlying Action alleges that Cabrera owed Cruz a duty to maintain the sidewalk in a reasonably safe condition "because of the nature of the 'business,'" and if Cruz's injury as alleged arose out of Cabrera's failure to do so, then the exclusion would apply.  For the Court to so find and grant summary judgment to MIC General on this point, the evidence must establish three propositions: that (1) Cabrera ran the Building as a "business"; (2) Cabrera owed Cruz a duty to keep the sidewalk reasonably safe for tenants to traverse to the garbage area which arose from "the nature of the 'business'"; and (3) Cruz's injury arose "in connection with" Cabrera's failure to carry out that duty.  In making these assessments as to the availability of coverage, the Court, to the extent drawing upon the Underlying Action, "look[s] to 'the factual allegations of the complaint, and not its legal characterizations of the underlying events.'"  *Swan Consultants*, 360 F. Supp. 2d at 588 (quoting *Dodge v. Legion Ins. Co.*, 102 F. Supp. 2d 144, 150 (S.D.N.Y. 2000)); *see also Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 449 n.12 (D. Conn. 2010) ("The key is what the plaintiffs in the underlying action might be able to prove, not will prove.").

### 1.      Did Cabrera Run the Building as a "Business"?

The Policy defines "business" as a "trade, profession or occupation," Policy at 71, but it does not define those terms.  Under New York law, whether an activity is a business pursuit

within the meaning of an insurance policy's business pursuits exclusion depends on whether the insured "regularly engaged in a particular activity with a view toward earning a livelihood or making a profit. To constitute a business, there must be two elements: "*first, continuity, and secondly, the profit motive.*" *Showler v. Am. Mfrs. Mut. Ins. Co.*, 690 N.Y.S.2d 369, 369 (N.Y. App. Div. 1999) (quoting *Broome County Co-Op. Fire Ins. Co. v. Kendall*, 576 N.Y.S.2d 945, 945 (N.Y. App. Div. 1991)) (emphasis in original); *see also Am. Family Home Ins. Co. v. Delia*, No. 12 Civ. 5380 (ADS), 2013 WL 6061937, at *5 (E.D.N.Y. Nov. 15, 2013). As to continuity, there must be a "a customary engagement or a stated occupation." *Fadden v. Cambridge Mut. Fire Ins. Co.*, 274 N.Y.S.2d 235, 241 (N.Y. Sup. Ct. 1966), *aff'd*, 280 N.Y.S.2d 209 (N.Y. App. Div. 1967); *see also Cardinal v. Long Island Power Auth.*, 309 F. Supp. 2d 376, 392 (E.D.N.Y. 2004). As to profit motive, "there must be shown to be such activity as a means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagements." *Fadden*, 274 N.Y.S.2d at 241.

Cabrera's long-term management of the Building easily satisfies the continuity element. *See Cardinal*, 309 F. Supp. 2d at 392 (continuity element satisfied where real estate agent had been charged with management and maintenance of property for 14 years). By his own account, every year since 2006, he has owned and rented out the Building, and for years he has written off on his taxes business expenses incurred in connection with the Building. *See* Cabrera Dep. at 23 ("Q: Did you take business deductions for the – for your repair work at [the Building]? A: Yes. Q: Did you report the rent as business income? A: I declared what I received for rent[.] Q: Sir, how long have you declared [the Building] as a business property? A: Since the date I bought."); *see also* Tax Returns at 6, 36, 55; Certification at 2. Cabrera also performs a wide range of maintenance and upkeep on the Building, including sometimes on his own initiative. Such work

includes remodeling and various projects to keep the Building in good order. *See* Cabrera Dep. at 24–25, 30, 51–52.

The profit motive element is also satisfied. Cabrera does not dispute that he ran the Building to make money. And, in his Certification in connection with applying for the Policy, he signed alongside handwriting, in Spanish, stating that the houses "are rented." *See* Certification at 28–29; *see also Cardinal*, 309 F. Supp. 2d at 392 (finding profit motive satisfied in insurance coverage case based in part on deposition testimony that the insured "cleaned up, straightened up, d[id] whatever [had] to be done" around the property, and performed work in preparation for a prospective tenant seeking to rent). Cabrera's profit motive is further confirmed by his tax returns, whose schedule of "Supplemental Income Sources" lists substantial income derived from the Building, and which reflects substantial tax deductions for expenses incurred in connection with the Building. Tax Returns at 6, 36, 55. Cabrera also took out advertisements to rent out rooms in the Building and executed leases with some residents. *See* Cabrera Dep. at 8, 42.

Cabrera argues that he did not run the Building as a "business" because he and his wife, who jointly file their taxes, have sources of income other than rental income from the Building. Dkt. 49 ("Cabrera Opp'n") at 12. That argument fails. That Cabrera has additional income sources does not negate the fact that he ran the Building "as a means of livelihood, gainful employment, [or] means or earning a living." *Fadden*, 274 N.Y.S.2d at 241. It merely suggests that Cabrera had multiple means of earning a living.

The Court accordingly finds that Cabrera ran the Building as a "business."

### 2.   Did Cabrera Owe Cruz a Duty, Arising from the Nature of the Business, to Keep the Sidewalk Reasonably Safe?

It is undisputed that Cabrera owed a duty to keep the sidewalk abutting the Building reasonably safe. *See* Cabrera Opp'n at 13; Dkt. 51 ("Cruz Opp'n") at 8. The dispute as to this

11

element concerns the *source* of that duty.  Defendants argue that Cabrera had a statutory duty to

this effect, "irrespective of whether his property is considered a business."  Cabrera Opp'n at 13;

*see* N.Y.C. Admin. Code § 7-210.  Put in Policy terms, defendants appear to argue that Cabrera's

duty to keep the sidewalk reasonably safe arose was statutory, based on his being a New York

City property owner, and did not arise from his role as a landlord.  MIC General counters that the

statute defendants cite does not apply to the Building, and that, in any event, New York common

law governing the landlord-tenant relationship imposed on Cabrera the duty at issue.

MIC General is again correct.  At the outset, the decisive issue is whether Cabrera owed

Cruz a duty to keep the sidewalk safe in his capacity as a landlord.  Even if Cabrera had the same

duty in other capacities (*e.g.*, as a property owner), the Exclusion by its terms is not limited to the

circumstance where the duty arose exclusively from the policy holder's business capacity.  Here,

there could have been multiple sources of Cabrera's duty to keep the sidewalk reasonably safe.

*Cf. Bryndle v. Boulevard Towers, II, LLC*, 132 F. Supp. 3d 486, 500 (W.D.N.Y. 2015) (as to duty

to conduct reasonable inspections, insured may have both a statutory duty to do so as a property

owner under the New York City Administrative Code and a common law duty to do so as a

landlord).  But under the text of the Policy, so long as one such source was "the nature of the

'business,'" this element of the Exclusion is met.  *See* Policy at 72.

Here, under New York law, Cabrera, by virtue of renting out the Building for profit,

owed his tenants the duty on whose breach Cruz's lawsuit (which faults Cabrera for failing to

remove the ice on the pathway to garbage disposal area) turns: to keep common areas such as

sidewalks reasonably safe.  *See, e.g., Bryndle*, 132 F. Supp. 3d at 500 (citing *Wynn v. T.R.I.P.*

*Redev. Assoc.*, 745 N.Y.S.2d 97, 100 (N.Y. App. Div. 2002) ("Under long-standing common

law, a landlord has a duty to use ordinary care to keep those areas which are reserved and

intended for the common use of the tenants and owner of the building and subject to the landlord's control, *i.e.*, the common areas, 'in a reasonably safe and suitable condition.'")); *Wynn*, 745 NY.S.2d at 100–01 (citing cases); *Fitje v. United States*, No. 11 Civ. 1604 (MKB), 2016 WL 1273236, at *6 (E.D.N.Y. Mar. 31, 2016) (same); *see also Antoine v. City of New York*, 868 N.Y.S.2d 688, 691 (N.Y. App. Div. 2008) ("[U]nder New York law, the coverage afforded by a premises liability policy extends by implication to that portion of an outside sidewalk necessary for access to the covered premises." (citing *ZKZ Assocs. LP v. CNA Ins. Co.*, 679 N.E.2d 629 (N.Y. 1997))); *Ambrosio v. Newburgh Enlarged City Sch. Dist.*, 774 N.Y.S.2d 153, 155 (N.Y. App. Div. 2004) ("Although the sidewalk where the injured plaintiff fell was not specifically named in the endorsement as leased premises, its use was incidental to the covered premises."). These precedents underscore that Cabrera had this duty "because of" the nature of his business (as a landlord). Defendants do not argue that these cases can be read otherwise. The existence of such a duty on a landlord's part thus resolves this element of the Business Pursuits Exclusion.

In any event, to the extent defendants wrongly posit that the existence of an alternative source of such a duty would defeat the Business Pursuits Exclusion, their analysis of the duty under New York City Administrative Code § 7-210 to keep a sidewalk reasonably safe is errant. Section 7-210 states, in relevant part: "It shall be the duty of the owner of real property abutting any sidewalk, including, but not limited to, the intersection quadrant for corner property, to maintain such sidewalk in a reasonably safe condition." N.Y.C. Admin. Code § 7-210(a). Under it, a property owner's "failure to remove snow, ice, dirt or other material from the sidewalk" exposes her to tort liability. *Id.* § 7-210(b); *see Lopez v. United States*, No. 10 Civ. 1758 (DF), 2012 WL 983560, at *8 (S.D.N.Y. Mar. 23, 2012) ("Section 7-210 requires owners of real

property abutting any 'sidewalk' to maintain that sidewalk in a reasonably safe condition, and it provides for liability where the failure to fulfill this duty proximately causes personal injury.").

Defendants depict this ordinance as applicable to all building owners. But that is incorrect. The ordinance "expressly excludes certain owner-occupied properties from its reach." *Xiang Fu He v. Troon Mgmt., Inc.*, 137 N.E.3d 469, 473 (N.Y. 2019); *see also Vucetovic v. Epsom Downs, Inc.*, 890 N.E.2d 191, 194 n.3 (N.Y. 2008). It states that it "shall not apply to one-, two- or three-family residential real property that is (i) in whole or in part, owner occupied, and (ii) used exclusively for residential purposes." N.Y.C. Admin. Code § 7-210(b). To be sure, that exception does not apply in this case, because Cabrera did not use the Building "exclusively for residential purposes"; rather, as shown, he also used it for the business purpose of obtaining rental income. But that reinforces that the Policy's Business Pursuits Exclusion applies in this case. That is because § 7-210(b)—which imposed on Cabrera the duty to keep the sidewalk reasonably safe—applies precisely *because* Cabrera ran the Building as a business. Put differently, the statutory duty, like the similar common law duty, applies, in the language of the Exclusion, "because of the nature of the 'business.'"[4]

---

[4] It is no answer to argue that, from the perspective of a tenant such as Cruz, the Building was "exclusively for residential purposes." From the perspective of owner Cabrera, the Building was used for *both* business and residential purposes. And the caselaw clarifies that that is the proper perspective. *See Sisler v. City of New York*, 924 N.Y.S.2d 329, 330 (N.Y. Sup. Ct. 2011) (defendant not entitled to summary judgment on the ground that she "failed to make a prima facie showing that she was exempt from liability" under § 7-210(b) where "she regularly performed a variety of tasks pertaining to her shoe business from her home," creating "a triable issue of fact whether defendant's real property was 'used exclusively for residential purposes'"); *cf. Coogan v. City of New York*, 73 A.D.3d 613, 614 (N.Y. App. Div. 2010) (affirming dismissal of complaint under § 7-210(b) where owner submitted affidavit establishing that he did not claim "any part [of the premises] as an income tax deduction"); *Town of New Castle v. Kaufmann*, 72 N.Y.2d 684, 687 (1988) (holding that § 7-210(b) applied where property owner's "total business use of their home amounted to merely 10 hours" and home office occupied only 17.5% of the floor space of the residence); *Koronkevich v. Dembitzer*, 48 N.Y.S.3d 188, 189 (N.Y. App. Div.

In sum, whether Cabrera's duty to keep the sidewalk reasonably safe flowed from

common law, a city statute, or both, it was "owed or implied to be provided because of the nature

of the 'business.'" Policy at 72. This second element of the Exclusion is also established.

### 3.   Does the Underlying Action Allege that Cruz's Injury Arose Out of Cabrera's Failure to Maintain the Sidewalk in a Reasonably Safe Condition?

The final issue is whether Cruz's injury "ar[ose] out of" or was "in connection with"

Cabrera's failure to maintain the sidewalk in a reasonably safe condition (the allegedly omitted

duty). "The 'arising out of' language, when used in an insurance policy exclusion, is construed

as a but-for test." *Swan Consultants*, 360 F. Supp. 2d at 59; *see also Outwater v. Ballister*, 678

N.Y.S.2d 396, 399 (N.Y. App. Div. 1998) ("[I]f the injury was caused by an act that would not

have occurred but for the business pursuits of the insured, said act is beyond the scope of the

policy."). The Second Circuit, synthesizing New York case law, has further held that "[a]n

insured is engaging in a business pursuit when his activities are 'incidental to his employment.'"

*Bowman v. Allstate Ins. Co.*, 238 F.3d 468, 470 (2d Cir. 2001) (per curiam) (quoting *Salimbene*

*v. Merchants Mut. Ins. Co.*, 629 N.Y.S.2d 913, 915 (N.Y. App. Div. 1995)) (citing cases).

Here, Cruz's Underlying Action alleges that but for Cabrera's negligent maintenance of

the sidewalk, to wit, Cabrera's failure to clear ice from the sidewalk, Cruz would not have been

injured. Cruz's Action pleads that Cabrera owned, operated, managed, controlled, and

maintained the sidewalk abutting the Building, Dkt. 45-4 ¶¶ 15–19; that Cabrera had a duty to

exercise reasonable care in his ownership and control of that sidewalk so as to keep it safe, *id.* ¶¶

20–22; that he negligently failed to do so, leaving it in a dangerous and defective condition, *id.*

---

2017) (holding that § 7-210(b) applied where "defendants' partial use of basement as an office
space was merely incidental to their residential use of the property" and they did not claim home
office as a tax deduction).

¶¶ 24–28; and that that condition caused Cruz to slip and fall and be injured, *id.* ¶¶ 23, 29.  These allegations clearly convey that Cruz's injury "ar[ose] out of or [was] in connection with" his asserted breach of the duty at issue.

The Business Pursuits Exclusion thus unambiguously applies, as the Underlying Action alleges that plaintiff Cruz's injury arose out of defendant Cabrera's breach of his duty to maintain the sidewalk abutting the Building in a reasonably safe condition—a duty Cabrera owed by virtue of having run the Building as a business.  The Court therefore grants MIC General summary judgment on the basis that the Business Pursuits Exception applies.[5]

### B.    The Rental Exclusion

The Rental Exclusion excludes from coverage bodily injury "arising out of the rental or holding for rental of any part of any premises."  Policy at 72.  But the exclusion contains an exception—which in turns embeds another exception.  Specifically, the exclusion does not apply if the Building were "in part for use only as a residence, *unless* a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders."  *Id.* (emphasis added).  The Court's analysis reviews this nest of provisions layer by layer.

---

[5] Cabrera makes two other arguments why this exclusion does not apply.  Neither succeeds. First, he states, the fact that the Policy covered Cabrera for the fair rental value of a unit in the event of natural disaster means the Policy must apply in the separate context involving rental usage that this case presents.  Cabrera Opp'n at 12–13.  But those scenarios implicate distinct sources of harm to a property owner: tort liability to a third party versus destruction of the premises.  In entering into the Policy, the insurer and insured were at liberty to agree that these different scenarios, implicating different interests, would yield different coverage outcomes. *See Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.*, 708 N.E.2d 167, 170 (N.Y. 1999) ("[W]holly different interests are protected by first-party coverage and third-party coverage.").  Second, he states that only a "home day care enterprise" qualifies as a "business pursuit."  *See* Dkt. 48 ¶ 10 (citing Policy at 77).  That argument misreads the Policy, which, while stating that a "home day care enterprise" is a "business pursuit," does not state that such enterprises are the *only* examples of business pursuits.

The parties do not dispute that Cruz's injury arose out of the rental. It clearly did, in that, but for his tenancy, Cruz would not have slipped on the sidewalk abutting the Building while taking out the garbage. The parties also do not dispute that the Building was "in part for use only as a residence." That too is clearly correct, in that Cabrera, along with his tenants, lived there.

The question, then, is whether the "unless" clause is triggered. If not, then the exception to the Rental Exclusion applies (and Cabrera wins on this point); if so, then the Rental Exclusion applies (and MIC General wins on this point). The parties accordingly take different positions whether the condition triggering the clause—"a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders"—existed as of Cruz's injury. They agree that each of the Building's two floors constituted a "single family unit." *See* Mot. at 19; Cabrera Dep. at 6 (describing Building as a "two-family" home). They also agree that more than two tenants occupied each unit. But, defendants argue, the exception does not apply because the Building's many tenants were not "roomers or boarders."

Familiar interpretive principles govern these terms. The Court "must give 'unambiguous provisions of an insurance contract . . . their plain and ordinary meaning.'" *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir. 2011) (quoting *Essex Ins. Co. v. Laruccia Constr., Inc.*, 898 N.Y.S.2d 558, 559 (N.Y. App. Div. 2010)). Although the Policy does not define the terms "roomers" or "boarders," "it is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *Id.* at 120 (quoting *Mazzola v. Cnty. of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988)).

Merriam-Webster defines "roomer" as "one who occupies a rented room in another's house."[6] That definition accords both with the everyday understanding of a "roomer" as one who lives in a room and analogous case law. *See, e.g., Bates v. Cole*, 550 N.Y.S.2d 271, 271 (N.Y. App. Div. 1990) (finding that policy exclusion for the event of "more than two roomers or boarders" was triggered because there were "at least three tenants paying for room and board" and affirming grant of summary judgment to insurance company).

Defendants, however, argue that the term "roomer" should be construed to mean:

> [A] person who is permitted for a consideration to occupy or use a room or rooms for living purposes but is not permitted to do any cooking on any part of the premises, or the building in which the room or rooms is or are located and does not partake of meals with others in such building.

Cabrera Opp'n at 15. Because the Building's tenants indeed cooked on the premises, defendants argue, they cannot have been "roomers." *Id.* at 15–16.

Defendants' argument, however, has no anchor in recognized principles of construction. It is instead based on a 1945 New York state trial court decision that interpreted a Yorktown, New York town zoning ordinance that contained the definition above. *See Simmons v. Pinsky*, 58 N.Y.S.2d 573, 576 (N.Y. Sup. Ct. 1945). But defendants do not attempt to explain why the Court should read the Policy to have adopted that obscure definition. Nor did they show that that definition has been adopted elsewhere (in case law, statutes, regulations, or insurance policies).

Absent credible contrary authority, the Court—in line with the dictionary definition and *Bates*—holds each of the Building's tenants, *i.e.*, the residents other than landlord Cabrera, to

---

[6] *Roomer*, Merriam-Webster.com (available at https://www.merriam-webster.com/dictionary/roomer) (accessed Nov. 22, 2021). *See Denn v. Vanguard Ins. Co.*, 707 F. Supp. 104, 106 n.1 (E.D.N.Y. 1989) ("Webster's New World Dictionary defines 'roomer' as 'a person who rents a room or rooms to live in.'").

have been a "roomer."  As the summary judgment record establishes, up to 19 people—eight

downstairs, up to 11 upstairs—were roomers in the Building as of the date of Cruz's injury.  *See*

*supra* Section I.A.1.[7]  The "unless" clause of the Rental Exclusion is therefore triggered—and

the Rental Exclusion applies.  MIC General is therefore independently entitled to summary

judgment on that basis.

### C.    Defendants' Claim of an Untimely Disclaimer

In a final attempt to block MIC General's motion for summary judgment, defendants

argue that its disclaimer of coverage was untimely.  They cite a New York insurance statute

providing that "an insurer shall disclaim liability or deny coverage for death or bodily injury

arising out of . . . any other type of accident" via "written notice as soon as is reasonably

possible."  N.Y. Ins. Law § 3420(d); *see Worcester Ins. Co. v. Bettenhauser*, 734 N.E.2d 745,

747 (N.Y. 2000) (detailing scenarios in which disclaimer under § 3420(d) is required).

Defendants depict MIC General as disclaiming solely based on the assertion—not pursued on the

instant motion—that the Policy did not apply because the Building did not qualify as an "insured

location," and *not* based on either the Business Pursuits Exclusion or the Rental Exclusion.  MIC

General counters with a claim of procedural default of its own: that defendants did not timely

raise this objection, having so asserted for the first time in their response to MIC General's

instant motion for summary judgment.  Dkt. 54 at 7–9.

The parties' dueling claims of untimeliness are academic.  That is because defendants are

wrong in their premise that MIC General failed to disclaim coverage under the Business Pursuits

Exclusion or Rental Exclusion.  To be sure, MIC General's Disclaimer lists as its second reason

why there was no coverage that the Building "does not qualify as an 'insured location.'"  *See*

---

[7] The Court has no reason to determine whether the tenants were also "boarders," as their being
"roomers" alone triggered the "unless" clause.

Disclaimer at 5. But, vitally, the Disclaimer lists as its third reason why there was not coverage that "this matter arises out of or in connection with a 'business' engaged in by an 'insured' and or the rental or holding for rental of a premises by an 'insured' and that is not an 'insured location.'" *Id.* at 6. That language squarely invoked the two exclusions at issue here. And MIC General's Complaint again squarely invoked both the Business Pursuits and Rental Exclusions as independent bases for finding that Cruz's claims against Cabrera were not covered. *See* Dkt. 1 ¶¶ 16, 22, 38.

Defendants argue that the final clause of the Disclaimer, "*and* that is not an 'insured location,'" disentitles MIC General from relying on the Business Pursuits and Rental Exclusions. The Disclaimer is not coherently so read. Contrary to defendants' reading, the use of the word "and" preceding that clause, fairly read, sets out MIC General's view that coverage was lacking for multiple independent reasons. It is not naturally—and need not be—read to connote that the only reason for disclaiming coverage was that the Building was not an "insured location."

And defendants' crimped construction would disserve the evident purpose of § 3420(d), which is to give fair notice to the claimant as to the insurer's grounds for disclaiming, and thereby "avoid prejudice to an injured claimant who could be harmed by delay in learning the insurer's position." *Bettenhauser*, 734 N.E.2d at 748. MIC General's Disclaimer here, which quoted directly from both exclusions at issue, supplied such notice. This case is thus a far cry from *Bettenhauser*, for instance, in which the insurance company "waited more than a year to deny coverage, all the while subjecting [plaintiff] to discovery demands, and ultimately consenting to settlement of his action against the [alleged tortfeasor]." *Id.* Quite the contrary, MIC General set out to Cabrera from the outset its view the Business Pursuits Exclusion and Rental Exclusions precluded coverage of him in the Underlying Action brought by Cruz.

## CONCLUSION

For the foregoing reasons, the Court grants in full MIC General's motion for summary judgment.  The Court issues a declaratory judgment in favor of MIC General, to the effect that its Policy does not cover Cabrera in the Underlying Action brought by Cruz, and that MIC General is entitled to cease providing a defense to Cabrera in that action.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 44 and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: December 10, 2021
       New York, New York